Philip Gordon ISBN 1996
Bruce S. Bistline ISBN 1988
GORDON LAW OFFICES
623 West Hays Street
Boise, ID  83072
Telephone: (208) 345-7100
Facsimile: (208) 345-0050
E-mail: pgordon@gordonlawoffice.com

*[Proposed] Liaison Counsel for [Proposed] Lead Plaintiffs*

MOTLEY RICE LLC
James M. Hughes (*pro hac vice*)
Ann K. Ritter (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9440
E-mail: jhughes@motleyrice.com
E-mail: aritter@motleyrice.com

*[Proposed] Lead Counsel for [Proposed] Lead Plaintiffs*

*Additional Counsel listed in Signature Page*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| BRICKLAYERS OF WESTERN PENNSYLVANIA PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 1:12-cv-00042-BLW |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) ) | **MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF INSTITUTIONAL** |
| v. | ) ) ) | **INVESTORS FOR CONSOLIDATION, APPOINTMENT** |
| HECLA MINING COMPANY, PHILLIP S. BAKER, JR. and JAMES A. SABALA, | ) ) ) | **AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF COUNSEL, AND IN OPPOSITION** |
| Defendants. | ) ) ) ) | **TO COMPETING MOTIONS** |

|  |  |
|---|---|
| JOSEPH S. VITA 2001 REVOCABLE TRUST and JOSEPH S. VITA IRA, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) ) | Case No. 2:12-cv-00067-BLW |
| Plaintiffs, ) ) | CLASS ACTION |
| v. ) ) | |
| HECLA MINING COMPANY, PHILLIP S. BAKER, JR. and JAMES A. SABALA, ) ) ) | |
| Defendants. ) ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 2

    A.    The Related Actions Should Be Consolidated ..................................... 2

    B.    The Hecla Investor Group Should Not Be Appointed Lead Plaintiff ..................... 2

        1.    HIG Does Not Have the Largest Financial Interest in the Relief Sought ......................................................................................... 2

            a.    HIG should not be able to claim 100% of the option costs as losses ................................................................ 3

            b.    A more rational method of calculating the options holders' losses demonstrates that they are far less than claimed ................. 5

            c.    The Peter M. Quist Family Trust is both a net seller and a net gainer ................................................................... 9

            d.    A member of the Institutional Investors has the greatest individual loss ............................................................. 10

        2.    HIG Is Subject to a Unique Defense Because Peter M. Quist Did not Evidence Standing To Move on Behalf of the Family Trust ............. 10

        3.    HIG's PSLRA Certifications Are Deficient ............................... 13

    C.    The Institutional Investors Should Be Appointed Lead Plaintiff ......................... 14

        1.    The Institutional Investors Have the Largest Financial Loss .................... 14

        2.    The Institutional Investors Satisfy the Requirements of Rule 23 ............. 14

            a.    LRI has standing to bring suit on behalf of its fund ..................... 16

            b.    The Institutional Investors need not have standing to advance claims concerning Hecla stock options to be an adequate Lead Plaintiff ............................................... 18

CONCLUSION ...................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................. 22

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

i

# TABLE OF AUTHORITIES

CASES

*Chill v. Green Tree Financial Corp.*,
    181 F.R.D. 398 (D. Minn. 1998) ...................................................................... 13

*City of Marysville General Employees' Retirement System v. Nighthawk Radiology*
    *Holdings, Inc.*,
    No. CV 09-659-EJL-CWD, 2010 WL 2000040 (D. Idaho May 19, 2010) ............................ 15

*Ferrari v. Gisch*,
    225 F.R.D. 599 (C.D. Cal. 2004) ...................................................................... 13

*Ferrari v. Impath, Inc.*,
    No. 03 Civ. 5667 (DAB), 2004 U.S. Dist. LEXIS 13898 (S.D.N.Y. July 20, 2004) .............. 14

*Fishbury, Ltd. v. Connetics Corp.*,
    No. 06 Civ. 11496 (SWK), 2006 WL 3711566 (S.D.N.Y. Dec 14, 2006) ........................ 19, 20

*Glauser v. EVCI Career Colleges Holding Corp.*,
    236 F.R.D. 184 (S.D.N.Y. 2006) ...................................................................... 20

*Hevesi v. Citigroup, Inc.*,
    366 F.3d 70 (2d Cir. 2004) ...................................................................... 19

*In re Atlas Mining Co. Securities Litigation*,
    No. CV 07-428-N-EJL-MHW, 2008 WL 821756 (D. Idaho Mar. 25, 2008).......................... 2

*In re Bard Associates, Inc.*,
    No. 09-6243, 2009 WL 4350780 (10th Cir. Dec. 2, 2009)...................................... 12

*In re Bausch & Lomb Inc. Securities Litigation*,
    244 F.R.D. 169 (W.D.N.Y. 2007)...................................................................... 10

*In re Cavanaugh*,
    306 F.3d 726 (9th Cir. 2002) ...................................................................... 8, 14

*In re Countrywide Financial Corp. Securities Litigation*,
    273 F.R.D. 586 (C.D. Cal. 2009)...................................................................... 5

*In re Global Crossing, Ltd. Securities Litigation*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) ............................................................ 19, 20

*In re Initial Public Offering Securities Litigation*,
    214 F.R.D. 117 (S.D.N.Y. 2002) ...................................................................... 19

*In re McKesson HBOC, Inc. Securities Litigation*,
    97 F. Supp. 2d 993 (N.D. Cal. 1999) ................................................................ 9

*In re Netflix, Inc., Securities Litigation*,
    Nos. 12-0225 SC, 12-1030 LHK, 2012 WL 1496171 (N.D. Cal. Apr. 27, 2012)................... 11

*In re Spectranetics Corp. Securities Litigation*,
    No. 08-cv-02048-REB-KLM, 2009 WL 1663953 (D. Colo. June 15, 2009).......................... 11

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

ii

*In re Telxon Corp. Securities Litigation*,
  67 F. Supp. 2d 803 (N.D. Ohio 1999)............................................................... 12

*In re Vivendi Universal, S.A. Securities Litigation*,
  605 F. Supp. 2d 570 (S.D.N.Y. 2009) ..................................................... 16, 17, 18

*Martino-Catt v. E.I. duPont de Nemours & Co.*,
  213 F.R.D. 308 (S.D. Iowa 2003) .......................................................................... 6

*Miller v. Dyadic International, Inc.*,
  No. 07-80948-CIV, 2008 WL 2465286 (S.D. Fla. Apr. 18, 2008)........................... 12

*Niederklein v. PCS Edventures!.com, Inc.*,
  No. 1:10-cv-00479-EJL-CWD, 2011 WL 759553 (D. Idaho Feb. 24, 2011)......... 10, 13, 14, 15

*NLRB v. Amax Coal Co.*,
  453 U.S. 322 (1981).......................................................................................... 17

*Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*,
  698 F.2d 320 (7th Cir. 1983) ............................................................................. 18

*Perlmutter v. Intuitive Surgical, Inc.*,
  No. 10-CV-03451-LHK, 2011 WL 566814 (N.D. Cal. Feb. 15, 2011)....................... 9

*Ravens v. Iftikar*,
  174 F.R.D. 651 (N.D. Cal. 1997)......................................................................... 16

*Richardson v. TVIA, Inc.*,
  No. C 06 06304 RMW, 2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) .................... 15

*Schueneman v. Arena*,
  No. 10-cv-1959 (BTM), 2011 WL 3475380 (S.D. Cal. Aug. 8, 2011) .................... 18

*Securities & Exchange Commission v. Dunn*,
  No. 2:09-CV-2213 JCM (LRL), 2011 WL 2623509 (D. Nev. June 30, 2011) ........... 3

*Seinfeld v. Becherer*,
  461 F.3d 365 (3d Cir. 2006) ................................................................................ 5

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) ............................................................................... 18

*Weinberg v. Atlas Air Worldwide Holdings, Inc.*,
  216 F.R.D. 248 (S.D.N.Y. 2003) ......................................................................... 20

*Weisz v. Calpine Corp.*,
  No. 4:02-CV-1200, 2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ...................... 11

STATUTES

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) ........................................................................ 1

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)............................................................................ 11

29 U.S.C. § 1103(a) .............................................................................................. 17

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

iii

<u>OTHER AUTHORITIES</u>

David Tabak, Svetlana Starykh & Marc Sholand, *A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud*, 5 Litig. Econ. Rev. 9 (2002) ........ 5, 6

<u>RULES</u>

Fed. R. Civ. P. 23(a)(3) .............................................................................................................. 15

## INTRODUCTION

Before the Court are four remaining motions for appointment as lead plaintiff.[1]  The movants are:  (1) the Institutional Investors, comprising LRI Invest S.A. and City of Atlanta General Employees' Pension Fund (Dkt. 18); (2) the Hecla Investor Group ("HIG"), comprising the Cambria County Employees Retirement System and the individuals David W. Quist and Peter M. Quist (Dkt. 25); (3) another Hecla Investor Group, comprising the individuals Jeffrey A. Farkas and David G. Ray (Dkt. 12); and (4) the Carpenters Pension Fund of West Virginia ("West Virginia") (Dkt. 24).  The second Hecla Investor Group and West Virginia are effectively out of the running for appointment as lead plaintiff, with claimed losses of $125,565 and $16,490, respectively, that are dwarfed by the claimed loss of the Institutional Investors.

The Hecla Investor Group suffers from several issues that preclude its appointment as lead plaintiff.  First, HIG does not have the largest financial interest in the relief sought by the class, as required by the Private Securities Reform Litigation Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  Second, one of the HIG members, Peter Quist, is moving individually as a member of HIG.  However, his Amended PSLRA Certification (but not his Original Certification) names the entity engaging in the transactions in Hecla securities during the Class Period as the "Peter M. Quist Family Trust."  But nowhere in HIG's lead plaintiff papers is the Peter M. Quist Family Trust mentioned, which presents the serious issue of whether Peter M. Quist has standing to act on behalf of the Trust and whether the Trust's purported losses should be included in HIG's combined losses.  Finally, the Amended Certifications of every HIG

---

[1] Movant Buddy Cox withdrew his Motion on April 20, 2012.  (Dkt. 35.)  Movant W. Scott Nichols withdrew his Motion on April 23, 2012.  (Dkt. 40.)  Movants James R. Holton and Michael P. Schneider filed a response on April 23, 2012, recognizing that they "are not the presumptive lead plaintiffs under the Private Securities Litigation Reform Act of 1995."  (Dkt. 38.)

MEM. OF LAW IN FURTHER SUPPORT OF MOT. of
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

1

member show that the Original Certifications did not accurately reflect the amounts, types, and names of the claimed losses and entities claiming the losses, raising serious concerns about HIGs adequacy.  As the Institutional Investors demonstrate below, they have the largest financial interest and meet Federal Rule of Civil Procedure 23's typicality and adequacy requirements. Therefore, they respectfully request that the Court appoint them lead plaintiff, and approve their choice of counsel.

## ARGUMENT

**A.    The Related Actions Should Be Consolidated**

As the Institutional Investors argued in their opening Memorandum of Law, the related cases *Bricklayers of Western Pennsylvania Pension Plan v. Hecla Mining Co.*, No. 1:12-cv-00042-BLW (D. Idaho filed Feb. 1, 2012), and *Joseph S. Vita 2001 Revocable Trust v. Hecla Mining Co.*, No. 2:12-cv-00067-ELJ (D. Idaho filed Feb. 14, 2012), should be consolidated.  *See* Mem. of Law in Support of Mot. of Institutional Investors for Consolidation, Appointment as Lead Pl., & Approval of Selection of Counsel at 5-6 (Dkt. 19).

**B.    The Hecla Investor Group Should Not Be Appointed Lead Plaintiff**

**1.    HIG Does Not Have the Largest Financial Interest in the Relief Sought**

"Courts typically apply the 'Olsen-Lax' factors to determine who has the largest financial interest.  These factors consider the number of shares purchased during the class period, the number of net shares purchased during the class period, the total net funds [expended] during the class period and the approximate losses suffered."  *In re Atlas Mining Co. Sec. Litig.*, No. CV 07-428-N-EJL-MHW, 2008 WL 821756, at *5 n.9 (D. Idaho Mar. 25, 2008) (citation and emphases omitted).  As shown below, the Individual Investors prevail on each of the Olsen-Lax factors.

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

2

HIG claims total losses of $1,710,429 in its Amended Loss Chart. (Dkt. 43-4.) Of that $1,710,429, David Quist claims losses of $1,033,961 and Peter Quist claims losses of $351,807 in call option transactions – for a total of $1,385,768 in purported losses attributable solely to call options.[2] (*Id.*) These alleged option losses represent approximately 81% of HIG's claim losses. *See* Decl. of Peter J. Butler in Support of the Institutional Investors' Mot. for Lead Pl. & Approval of Selection of Counsel ("Butler Decl.") ¶ 9, attached as Ex. A to the Decl. of James M. Hughes ("Hughes Decl."). HIG claims that 100% of the call option costs, minus any proceeds received from sales of its calls, should be counted towards its losses. *Id.* The Institutional Investors, in contrast, are claiming only a fraction of the original cost of their common stock purchases as losses. *Id.*

> **a.      HIG should not be able to claim 100% of the option costs as losses**

As the Institutional Investors' financial expert explains, HIG can count 100% of the alleged losses related to the options transactions under only one of two assumptions:

> a.      The options traders would not have purchased the options had they known about the fraud, or

> b.      The call options expired worthless due solely to the fraud.

*Id.* ¶ 11. Assumption (a) is virtually impossible to determine. Investors purchasing option positions in stock usually choose a strike price – the agreed-to price in an options contract – based on the share price of the stock. *Id.* ¶ 14. Thus, an options purchaser who knew about the fraud and the inflation it caused may have still purchased options, but at different terms. *Id.*

---

[2] "A call option is an agreement that gives an investor the right to buy a stock at a specified price within a specific time period, while a put option is a similar agreement with a right to sell, rather than buy. A call option is profitable when the underlying stock increases in price, whereas a put option is profitable when the underlying stock decreases in price." *SEC v. Dunn*, No. 2:09-CV-2213 JCM (LRL), 2011 WL 2623509, at *1 n.1 (D. Nev. June 30, 2011).

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

3

There is simply no way to know.  Given the inability to know what options traders would do in such a situation, it is unreasonable to include the entire cost of the options as alleged losses. Treating the entire cost of the options (minus any gains from sales) as the loss suffered, which is what HIG does, confuses the Olsen-Lax "net expenditure" factor with the "loss" factor.

Assumption (b) also does not allow HIG to claim 100% of its original call options costs as losses because it is not logical that the call options expired worthless *solely* because of the fraud.  David Quist bought call options at various prices from January 2011 through mid-March 2011 that expired in January 2012.  (Amended HIG Loss Chart (Dkt. 43-4).)  All of these call options had strike prices of either $10.00 or $12.50.  (*Id.*)  The Peter M. Quist Family Trust (the "Trust") also purchased January 2012 call options in January 2011 with strike prices of either $10.00 or $12.50, as well as June 2011 call options in December 2010 with a strike price of $15.00.  (*Id.*)

During the Class Period, the highest price Hecla common stock reached was $11.56 per share on January 3, 2011.  Butler Decl. ¶ 15(a).  Thus, even at its highest price during the Class Period, Hecla's $12.50 strike price was "out-of-the-money"[3] by $0.94, and the $15.00 strike price was "out-of-the-money" by $3.44.  *Id.* ¶ 15(a)(1).  Also, for a call option purchaser to profit from an option bet, the stock price must exceed the strike price by a certain amount so the purchaser can cover the transaction costs of the option.  "The more 'out-of-the-money' a stock option is at any given point in time, all else being equal, the more likely it will expire worthless." *Id.*  Yet HIG is claiming $186,864 in alleged losses for call options with strike prices of $12.50

[3] "Out-of-the-money" is when an option's strike price is greater than the current price of the underlying stock.  "In-the-money" is when the intrinsic value of the option is positive because the strike price is less than the current stock price.  Call options have value even if they are "out-of-the-money" today because there is some probability that they will be "in-the-money" at or before expiration.  Butler Decl. ¶ 12.

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

4

and $49,125 in alleged losses for call options with strike prices of $15.00.  (HIG Amended Loss Chart); *see also* Butler Decl. ¶ 15(a)(ii).  And, although the $10.00 strike price options had a better chance of eventually being "in-the-money," it is quite possible that the $10.00, $12.50, and $15.00 strike price options all would have expired worthless even without the fraud-correcting disclosure(s) entering the market.  Butler Decl. ¶ 15(a)(ii)-(iii).

As the Institutional Investors' expert notes, "courts have generally not looked favorably on a claim that but-for a fraud a transaction would have occurred, regarding such claims as inherently speculative."  *Id.* ¶ 15(b) (quoting David Tabak, Svetlana Starykh & Marc Sholand, *A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud*, 5 Litig. Econ. Rev. 9, 13 (2002) [hereinafter "Tabak"], attached as Hughes Decl., Ex. B).

### b. A more rational method of calculating the options holders' losses demonstrates that they are far less than claimed

To calculate the impact of fraud-correcting disclosures on the price of common stock, forensic economists generally use event studies to see what price reactions accompany such disclosures.  This method is not feasible with options, because, for one thing, options do not trade every day.  *Id.* ¶ 16 n.6; *see also* Tabak at 10 ("Using a similar [event study] methodology to calculate the inflation in a call option is likely to be more complicated, and more subject to debate, than the analogous procedure for the underlying stock.  The result is likely to be intractable.").  Therefore, forensic economists have turned to a well-developed model to calculate damages for options holders:  the Black-Scholes Option Pricing Model ("BSOPM").[4]

---

[4] "'Black-Scholes' is a widely accepted formula for calculating the value of a stock option." *Seinfeld v. Becherer*, 461 F.3d 365, 373 n.4 (3d Cir. 2006); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) (describing the Black-Scholes pricing model as "a widely accepted option pricing model"); *Martino-Catt v. E.I. duPont de Nemours &*

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

5

*See* Butler Decl. ¶ 16; Tabak at 11.  The BSOPM is a tool "to measure or calculate the option's actual price and its true value and then to take the difference between the two to determine the inflation in the option premium."  Tabak at 11.

The basic idea behind the BSOPM is that "plaintiffs would have purchased the 'same' call options, except with the price inflation removed from the stock."  Butler Decl. ¶ 17.  The inputs required to calculate the value of a call option include:  (a) the share price; (b) the strike price; (c) the dividend yield of the stock; (d) the risk-free interest rate over the term of the option; and (d) the expected volatility of the stock.  *Id.* ¶ 17.  Mr. Butler had values for all of the inputs, and could calculate the expected volatilities.  *Id.*  For the share price, Mr. Butler subtracted $0.90 from the actual share price to account for the estimated inflation in the Hecla stock price.[5]  When the $0.90 inflation is subtracted from the share price, the call option price is lower because the option is "out-of-the-money" by a wider margin.  *Id.*  Thus, under the BSOPM, "estimated damages are merely the actual price paid for the options minus the 'true' cost of the call options."  *Id.*

Mr. Butler's calculations using the BSOPM method and the inputs he used are presented in Schedule 1 to his Declaration.  He calculates that David Quist's loss from call options trades was approximately $284,000 – not $1,034,000 as claimed – and that the Peter M. Quist Family Trust net loss from call options trades was approximately $38,000 – not $352,000 as claimed.

---

*Co.*, 213 F.R.D. 308, 311 n.3 (S.D. Iowa 2003) ("The Black–Scholes Option Pricing Method is a common option-pricing method first developed in 1973 by Fischer Black and Myron Scholes.")

[5] Hecla stock closed at $5.84 on January 10, 2012, the day before the disclosure of the fraud.  Both HIG and the Institutional Investors valued the retained shares in their loss calculations at $4.94.  *See* Amended HIG Loss Chart (Dkt. 43-4); Institutional Investors Loss Chart (Dkt. 20-3).  The difference between $5.84 and $4.94 ($0.90) is the inflation in the stock.  Butler Decl. ¶ 17 n.8.

*Id.* ¶ 19, Schedule 1.  Mr. Butler therefore estimates that HIG suffered total losses of only

approximately $646,433, not over $1,710,000, as HIG claims.  *Id.*  The following Olsen-Lax

four-factor chart presents a more realistic and accurate account of the financial interest of HIG

resulting from the BSOPM calculations, compared to the Institutional Investors' financial

interest:

| Movant | Number of purchased shares | Net purchased shares | Net Funds Expended | FIFO Loss | LIFO Loss |
|---|---|---|---|---|---|
| **Institutional Investors Total** | **762,978** | **735,541** | **$4,834,030** | **($1,303,555)** | **($1,195,643)** |
| LRI | 700,000 | 700,000 | $4,561,365 | ($1,098,783) | ($1,098,783) |
| Atlanta GEPF | 62,978 | 35,541 | $272,665 | ($204,772) | ($96,860) |
| | | | | | |
| **Hecla Investor Group (Cambria-Quist) Total** | **127,308** | **77,408** | **$1,874,477** | **($646,433)** | **($646,433)** |
| Cambria County | 101,400 | 86,500 | $660,098 | ($232,390) | ($232,390) |
| D. Quist **CALLS** | 0 | 0 | $1,033,961 | ($283,903) | ($283,903) |
| P. Quist Acct. 1 | 1,808 | 1,808 | $17,858 | ($8,918) | ($8,918) |
| P. Quist Family Trust **CALLS** and common stock | 0 | (35,000) | ($39,957) | ($37,870) | ($37,870) |
| P. Quist Acct. 2 | 24,100 | 24,100 | $202,517 | ($83,352) | ($83,352) |

The Olsen-Lax four-factor chart makes clear that the Institutional Investors prevail on every

factor, and thus have the greatest financial interest in the litigation.

Mr. Butler's option valuation calculations were time consuming, even for only the five

option contracts the HIG movants bought and sold.[6]  *Id.* ¶ 20.  Each of the HIG option contracts

had different damages, even with the same inflation per share in the stock price.  *Id.*  Thus, to

estimate class-wide call option damages "involves calculating the loss associated with each

option contract on each day of the Class Period and then determining the volume attached to

each contract for each day of the Class Period," which would be a "daunting and expensive

---

[6] For example, as of May 2012, there were 66 different call option contracts on Hecla's common
stock.  *Id.* ¶ 20 n.11.

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

7

task." *Id.* Thus, "[t]here is no 'typical' option holder per se as each contract reacts differently to

the fraud" and "the same option contract . . . reacts differently every single day of the Class

Period. *Id.*

As Mr. Butler notes, a call option on a stock is simply different from the underlying

associated common stock. A call option is a way for an investor to leverage his or her "bet."

*Id.* ¶ 21. For example, if a stock is selling for $10.00 per share, an investor can buy 100 shares of

the stock for $1,000, or an investor can buy a call option. If the price of the call option on the

stock is $1.00 per 100 shares, one potentially can gain access to 100 shares of stock for only

$100 (the call premium). If the call option is "in-the-money" before the expiration date, one

must, of course, pay the exercise price to gain control of the shares. *Id.* If, however, the call

option expires "out-of-the-money," one's original $100 investment, or "bet," was for naught.

Thus, unlike stock transactions, option trading is a zero-sum game; someone always loses.[7] In

essence, options are worth just a fraction of the underlying common stock, and they have a

limited (gross) downside. Butler Decl. ¶ 21. HIG's loss calculations ignore this fact. Their

options holders consider their losses to be their entire investment, or all of their (gross)

downside. Common stock holders, on the other hand, consider their losses to be only a fraction

of their original purchase price. *Id.*[8]

---

[7] "Options and future contracts are examples of zero-sum games (excluding costs). For every person who gains on a contract, there is a counter-party who loses. Gambling is also an example of a zero-sum game." *Investopedia*, available at: http://www.investopedia.com/terms/z/zero-sumgame.asp#axzz1ulLP0bSc.

[8] As the Ninth Circuit has observed, "To make this calculation [of which plaintiff has the most to gain from the lawsuit], the district court must calculate each potential lead plaintiff's financial interest in the litigation. In doing so, the court may select accounting methods that are both rational and consistently applied." *In re Cavanaugh*, 306 F.3d 726, 730 n.4 (9th Cir. 2002).

A rational and widely-used method for valuing options shows that HIG has overestimated its claimed losses from call option trades during the Class Period.  A more reasonable estimate of HIG's options-related losses is $321,773.  Butler Decl. Schedule 1.  As the chart above shows, this puts HIG's total estimated loss at $646,433.  The Institutional Investors' estimated loss is $1,303,555 using a first-in, first-out (FIFO) method, and $1,195,643 using a last-in, first-out (LIFO) method.  Therefore, the Institutional Investors have the largest financial interest in the relief sought by the class, and, as demonstrated in their Opening Memorandum at 9-12 (Dkt. 19), meet Federal Rule of Civil Procedure 23's typicality and adequacy requirements.  The Institutional Investors thus are entitled to the legal presumption that they are the most adequate plaintiffs to serve as lead plaintiff.

### c.    The Peter M. Quist Family Trust is both a net seller and a net gainer

The Olsen-Lax four-factor chart also shows that the Peter M. Quist Family Trust is a "net seller" (i.e., it sold more shares that it purchased during the class period) and a "net gainer" (i.e., it actually made money on its sales of Hecla shares during the class period).  As the Northern District of California recently noted, "In general, net purchasers have a greater interest in a securities lawsuit because a net purchaser was induced by the fraud to purchase shares and has been left 'holding the bag' when the fraud is eventually revealed."  *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2011 WL 566814, at *8 (N.D. Cal. Feb. 15, 2011) (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999)).  The court contrasted a net purchaser with a net seller, who arguably profits more from the fraud than suffers from it.  *Id.*  "A net gainer is a party who profited from the purchase and sale of a defendant's stock during the class period."  *Id.*  The *Intuitive Surgical* court denied the motion of a movant who was both a net seller and a net gainer, like the Trust.  *Id.* (citing *In re Bausch &*

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

9

*Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007)) (citing numerous cases that rejected applications for lead plaintiff status made by "net sellers" and "net gainers")).

> **d.      A member of the Institutional Investors has the greatest individual loss**

In their initial pleadings, the Institutional Investors specifically requested that "[i]f the Court is not inclined to appoint both members of the Institutional Investors, they respectfully request that the Court consider appointment of either of them individually."  Mem. of Law in Support of Mot. of Institutional Investors for Consolidation, Appointment as Lead Pl., & Approval of Selection of Counsel (Dkt. 19) at 14 (citing *Niederklein v. PCS Edventures!.com, Inc.*, No. 1:10-cv-00479-EJL-CWD, 2011 WL 759553, at *8 (D. Idaho Feb. 24, 2011)). Institutional Investors member LRI, with an approximate loss of $1,098,783, has – by far – the largest individual loss of any single movant.  Therefore, if the Court decides it is not in the best interests of the Class to appoint a group, it should appoint LRI as lead plaintiff.

> **2.      HIG Is Subject to a Unique Defense Because Peter M. Quist Did not Evidence Standing To Move on Behalf of the Family Trust**

In both his Original Certification (Dkt. 25-6) and Amended Certification (Dkt. 43-2), submitted nearly two weeks later, Peter M. Quist declared under penalty of perjury that *his* "Class Period purchase and sale transaction(s) in Hecla Mining Company securities and options that are the subject of this action are attached in Schedule A.  Plaintiff is fully authorized to assert claims for all securities set forth in the Schedule A."  The Original Schedule A lists three accounts:  "Peter M. Quist-Account 1," "Peter M. Quist-Account 2," and "Peter M. Quist-Account 3."  Nowhere in his Original Certification, Original Schedule A, lead plaintiff motion, or memorandum in support of his motion is any mention made of a trust.  In his Amended

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

10

Schedule A, Peter M. Quist again lists three accounts:  "Peter M. Quist Family Trust," "Peter M. Quist-Account 1," and "Peter M. Quist-Account 2."[9]

The PSLRA requires that lead plaintiffs be subject to no "unique defenses."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  "There is no requirement at this early [lead plaintiff] stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial."  *In re Netflix, Inc., Sec. Litig.*, Nos. 12-0225 SC, 12-1030 LHK, 2012 WL 1496171, at *5 (N.D. Cal. Apr. 27, 2012).  The fact that Peter M. Quist moved for appointment as lead plaintiff individually, and not as trustee of the Peter M. Quist Family Trust, is highly problematic.

"While there is no dispute that a trustee has standing to bring a securities fraud action, the problem here is that [Peter M. Quist] is seeking appointment as lead counsel in his *individual* capacity, *not* as a 'trustee' of his family trust[]."  *Weisz v. Calpine Corp.*, No. 4:02-CV-1200, 2002 WL 32818827, at *7 (N.D. Cal. Aug. 19, 2002); *see also Netflix*, 2012 WL 1496171, at *5 (refusing to appoint group when one member moved in his own capacity, not as trustee of the trust whose losses were included in the calculation of losses because the issue presented a possible unique defense); *In re Spectranetics Corp. Sec. Litig.*, No. 08-cv-02048-REB-KLM, 2009 WL 1663953, at *4-5 (D. Colo. June 15, 2009) (refusing to appoint individual who moved in his own capacity, but included in his loss calculations the losses of a legally separate, wholly-owned LLC).

The Court should reject the proffer now of any evidence – such as an assignment or other legal document – that Peter M. Quist, in his individual capacity, is entitled to legally move for

---

[9] Despite the fact that some of the accounts share the same number in the different Schedule As, it appears as though the new "Peter M. Quist Family Trust" corresponds to the old "Account 2," the new "Account 1" corresponds to the old "Account 1," and the new "Account 2" corresponds to the old "Account 3."

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

11

lead plaintiff on behalf of the Peter M. Quist Family Trust, or to include the Trust's transactions and losses in his claimed losses.  In *In re Bard Associates, Inc.*, No. 09-6243, 2009 WL 4350780 (10th Cir. Dec. 2, 2009), the lower court concluded that a lead plaintiff movant "demonstrated its financial interest too late because it did not produce assignments of claims until after the 60-day deadline set forth in 15 U.S.C. § 78u-4(a)(3)(A)(i)(II)."  2009 WL 4350780, at *2.  The Tenth Circuit ruled that the district court's conclusion was not an abuse of discretion.  It also approved the district court's "[a]dopting a bright line rule requiring lead plaintiff movants to establish Article III standing by the time the lead plaintiff motions are due, that is, 'not later than 60 days after the date on which . . . notice is published,' 15 U.S.C. § 78u-4(a)(3)(A)(i)(II)."  *Id.* at *3; *see also Miller v. Dyadic Int'l, Inc.*, No. 07-80948-CIV, 2008 WL 2465286, at *5 (S.D. Fla. Apr. 18, 2008) ("[T]o allow supplementation after the expiration of the sixty (60) day period would be inconsistent with both the language and purposes of the PSLRA."); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999) ("The PSLRA is unequivocal and allows for no exceptions. . . . The plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, *or any other pleading, for that matter*, filed *after* the sixty (60) day window has closed.") (initial emphasis added).  Thus, the Court should refuse to consider any belated evidence or pleading purporting to establish Peter M. Quist's standing to move on behalf of the Trust, or to support the inclusion of the Trust's losses in HIG's loss calculations.  HIG's lack of timely evidence of standing presents a unique defense as to HIG, preventing it from meeting Rule 23's typicality requirement, and thus supports the appointment of the Institutional Investors as lead plaintiff.

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

12

### 3.      HIG's PSLRA Certifications Are Deficient

HIG's untimely Amended Certifications and Loss Charts highlight how deficient its original ones are.  For example:  (1) Cambria's Original Certification failed to include a sale that was made during the Class Period; (2) David W. Quist's Original Loss Chart showed 6,652 option purchases at a strike price of $10 and his Amended Loss Chart shows that 652 of those option purchases had a strike price of $12.50, not $10; and (3) Peter M. Quist's Original Account 2 became the Peter M. Quist Family Trust in his Amended Certification and Loss Chart.  The Original Account 2 failed to include pre-Class Period holdings of 35,000 shares of common stock or a sale of 35,000 shares of common stock during the Class Period, which resulted in proceeds of $311,850.  The Original Account 2 failed to include an option purchase for a June 2011 call for 655 contracts with a strike price of $15, and also failed to give the correct number of option contracts purchased.  The Original Account 2 listed 478 contracts for a January 2012 call with a strike price of $10, while the Amended Account changed that number to 975.

The above failures are not "minor or inadvertent mistakes" or "obvious or inconsequential clerical errors."  *See Niederklein*, 2011 WL 759553, at *11.  Nor are they "relatively minor miscalculations of losses" or "technical deficiencies."  *See id.* (citing *Ferrari v. Gisch*, 225 F.R.D. 599, 605 (C.D. Cal. 2004) (minor miscalculations of losses); *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 410-11 (D. Minn. 1998) (technical difficulties)).  Instead, sales and pre-class holdings are omitted, given strike prices are inaccurate, accounts are renamed, a Trust is added (with no evidence of standing on behalf of the individual counting its losses as his), and new strike prices are added.  These inadequacies in HIG's Original Certifications and Loss Charts should give pause to any decision to appoint HIG as lead plaintiff.

**C.     The Institutional Investors Should Be Appointed Lead Plaintiff**

**1.     The Institutional Investors Have the Largest Financial Loss**

As demonstrated above, the Institutional Investors have the largest financial interest in the relief sought.  A Black-Scholes analysis of HIG's losses shows that the Institutional Investors' have a much larger loss than HIG.

**2.     The Institutional Investors Satisfy the Requirements of Rule 23**

Under the PSLRA, once a court finds that a movant has the largest financial interest in the litigation, as is the case with the Institutional Investors here, the court must appoint that plaintiff as lead plaintiff unless the court finds that the movant has not made a prima facie showing of adequacy and typicality.  *See Niederklein*, 2011 WL 759553, at *9 ("At this point, the Court next must make an initial determination of whether the presumptively most adequate plaintiff has made a prima facia showing that he has satisfied Rule 23's typicality and adequacy requirements."); *Ferrari v. Impath, Inc.,* No. 03 Civ. 5667 (DAB), 2004 U.S. Dist. LEXIS 13898, at *17 (S.D.N.Y. July 20, 2004) ("At this stage in the litigation, one need only make a preliminary showing that the Rule's typicality and adequacy requirements have been satisfied.") (internal citation omitted).  As the Ninth Circuit has stated:

> [A] straightforward application of the statutory scheme, as outlined above, provides no occasion for comparing plaintiffs with each other on any basis other than their financial stake in the case.  Once that comparison is made and the court identifies the plaintiff with the largest stake in the litigation, further inquiry must focus on that plaintiff alone and [should] be limited to determining whether he satisfies the other statutory requirements.

*Cavanaugh*, 306 F.3d at 732.

The Institutional Investors satisfy the typicality and adequacy requirements of Rule 23. The claims of the Institutional Investors are typical of the claims of the rest of the Class because, just like other Class members, the members of the Institutional Investors purchased Hecla

securities during the Class Period in reliance on the allegedly materially false and misleading statements issued by Defendants, and suffered damages thereby.  Thus, the Institutional Investors' claims are typical of those of other Class members because all claims arise out of the same course of events.  *See City of Marysville Gen. Emps.' Ret. Sys. v. Nighthawk Radiology Holdings, Inc.*, No. CV 09-659-EJL-CWD, 2010 WL 2000040, at *4 (D. Idaho May 19, 2010) ("The 'typicality requirement' is satisfied when 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" (quoting Fed. R. Civ. P. 23(a)(3))).

The Institutional Investors are also adequate representatives of the Class.  As evidenced by the injuries suffered by the Institutional Investors, who purchased Hecla common stock at prices allegedly artificially inflated by Defendants' materially false and misleading statements, the interests of the Institutional Investors are clearly aligned with the interests of the members of the Class.  The Institutional Investors have also taken significant steps – including retaining highly qualified and experienced counsel to prosecute these claims –which demonstrate that they will protect the interests of the Class.  Finally, there is no evidence of any antagonism between the Institutional Investors' interests and those of the other members of the Class.  *See Niederklein*, 2011 WL 759553, at *9 ("[R]ule 23's adequacy requirement is satisfied 'if there are no conflicts between the representatives and the class interests and the representative's attorneys are qualified, experienced, and generally able to conduct the litigation.'") (quoting *Richardson v. TVIA, Inc.*, No. C 06 06304 RMW, 2007 WL 1129344, at *4 (N.D. Cal. Apr. 16, 2007)); *Nighthawk Radiology Holdings*, 2010 WL 2000040, at *4 (same).

Moreover, the two members of the Institutional Investors are institutional investors experienced in acting as fiduciaries, and who fit the profile of the type of lead plaintiff preferred by Congress.  LRI has over $13 billion in assets under management and has experience

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

15

managing mutual and specialized funds as a fiduciary of its investors since 1988.  Atlanta GEPF

has over $989.6 million in assets that it manages for the benefit of its active members, retirees,

and beneficiaries.  *See Ravens v. Iftikar*, 174 F.R.D. 651, 733 (N.D. Cal. 1997) ("Congress thus

endeavored to promote the active participation of institutional investors in these cases:

'Institutional investors and other class members with large amounts at stake will represent the

interests of the plaintiff class more effectively than class members with small amounts at stake.'"

(quoting House Conf. Rep. No. 104-369, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 733)).

### a.     LRI has standing to bring suit on behalf of its fund

HIG may attempt to rebut the Institutional Investors' prima facie showing of adequacy

and typicality by arguing that LRI lacks standing as an investment manager to pursue claims on

behalf of its fund, M & W Privat Sondervermögen (the "Fund").  Such an argument would be

without merit, however, because LRI, as a Luxembourgian investment manager, has the

exclusive right to take legal action on behalf of the Fund, which is a Luxembourg mutual fund,

or fond commun de placement ("FCP").  *See* Decl. of Claude Kremer in Supp. of the Mot. of

Institutional Investors Appointment as Lead Pl. ¶¶ 13-22 ("Kremer Decl."), attached as Ex. C to

the Hughes Decl.

This lack-of-standing argument was specifically rejected in *In re Vivendi Universal, S.A.*

*Securities Litigation*, 605 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2009), a case in which LRI was a

party (as was a Luxembourgian client of HIG's proposed lead counsel).  In *Vivendi*, the court

found that Luxembourg law gives LRI and other Luxembourg investment management

companies the exclusive right to take legal action on behalf of their FCPs.  605 F. Supp. 2d. at

579.  The *Vivendi* court found, crediting a declaration by Mr. Kremer, that FCPs have no

"corporate" or "legal" personality by which they can take legal action, and, as a result, an FCP's

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

16

investment management company has exclusive statutory authority under Luxembourg law to take legal action on the Fund's behalf.  *Id*. at 579-80.  In particular, the *Vivendi* court found:

> Designated management companies act for the FCPs, with each "act[ing] in its own name . . . indicat[ing] that it is acting on behalf of the FCP."  (Leermakers Decl. ¶ 4.10.)  The management companies have exclusive rights to manage the funds and bring legal actions against third parties.  (*Id*. ¶ 4.16 ("[The management company] may, as legal representative of the fund, start legal proceedings on behalf of the fund and seek damages for the suffered losses.  However, the management company's right to bring suit on behalf of an FCP is not based upon a transfer of ownership interest in the property held in the investment fund, but instead [upon] its status as the legal representative of the fund under Luxembourg law."); Kremer Decl. ¶ 20 ("No other party has the power to enter into agreements or take legal actions on behalf of the FCP, unless such other party is specifically authorized by the management company.").)

*Id*. at 579.

Thus, Luxembourg law is clear that a Luxembourgian management company has the exclusive authority to make investment decisions for, and to sue on behalf of, the FCPs it manages.  In this case, LRI has such exclusive authority to take legal action on behalf the Fund.  *See* Kremer Decl. ¶¶ 13-22.

LRI's exclusive authority to take action on behalf of the Fund is analogous in American law to that of trustees of pension plan funds subject to ERISA.  The ERISA statute provides that "'exclusive authority and discretion to manage and control the assets of the plan' [is vested] in the trustees alone, and not the employer or the union."  *NLRB v. Amax Coal Co*., 453 U.S. 322, 333 (1981) (quoting 29 U.S.C. § 1103(a)).  Because authority to administer an ERISA plan is vested in the trustee by statute, there is no question that the trustee has authority to make investment decisions for the fund, and that the trustee has standing to commence a securities action to recover losses incurred by the fund.  *See*, *e.g*., *Peoria Union Stock Yards Co. Ret. Plan*

MEM. OF LAW IN FURTHER SUPPORT OF MOT. OF
INSTITUTIONAL INVESTORS FOR CONSOLIDATION,
APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION
OF COUNSEL, & IN OPP'N TO COMPETING MOTS.

17

*v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 325-26 (7th Cir. 1983) (finding, in securities fraud action, that the "trustee is the proper party to sue on behalf of the trust").

HIG may attempt to rely on *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), to challenge LRI's standing by claiming that LRI must have an assignment from its Fund. Any such argument founders on two points. First, because the Fund is a Luxembourgian FCP with no legal personality, it cannot legally assign *anything*. Second, the relationship of a Luxembourgian asset management company to its FCPs is analogous to that of a trustee to a trust. The *Vivendi* court thoroughly analyzed this exact issue and unequivocally determined that "FCP management companies . . . have standing to bring suit on behalf of their investors under the *Huff* [prudential] exception." 605 F. Supp. 2d at 579. The *Vivendi* court held that "[t]he relationship between a management company and an FCP appears to be similar to that of trustee to beneficiary, and absent legal personality, *both sides' legal experts agree that neither the FCPs or their investors could bring suit on their own*." *Id.* (emphasis added).

### b. The Institutional Investors need not have standing to advance claims concerning Hecla stock options to be an adequate Lead Plaintiff

HIG may contend that the Institutional Investors "fall[] short of meeting the adequacy requirement because [they] did not suffer any losses in [the] purchase of call options of [Hecla]." *Schueneman v. Arena*, No. 10-cv-1959 (BTM), 2011 WL 3475380, at *5 (S.D. Cal. Aug. 8, 2011). Such an argument, if advanced, would be without merit and has been rejected by courts in this and other Circuits. *See id.* at *3-4 (rejecting argument that lead plaintiff movant was an inadequate class representative because it "purchased and sold only . . . common stock during the relevant class period," as opposed to options, and holding that "[t]he lead plaintiff does not need

Mem. of Law in Further Support of Mot. of
Institutional Investors for Consolidation,
Appointment as Lead Pl., & Approval of Selection
of Counsel, & in Opp'n to Competing Mots.

18

to have standing to sue on all causes of action raised in the underlying class complaints"); *see also Fishbury, Ltd. v. Connetics Corp.*, No. 06 Civ. 11496 (SWK), 2006 WL 3711566, at *4 (S.D.N.Y. Dec 14, 2006) (citing *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004)) ("It is well established law . . . that the lead plaintiff in a securities class action need not have standing to sue on all causes of action raised in the underlying class complaint."); *accord In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("It stands to reason that in many cases, the instant cases included, the plaintiff with the largest financial interest may not have standing to sue on all causes of action.").

Moreover, to the extent that class claims on behalf of purchasers of call options could not be advanced by the Institutional Investors because of standing or class certification issues, this deficiency is not determinative of their appointment as Lead Plaintiff, but instead is properly addressed at a later time by the designation of other members of the Class as named plaintiffs or class representatives. *Connetics*, 2006 WL 3711566, at *4; *see also Hevesi*, 366 F.3d at 83; *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204-05 (S.D.N.Y. 2003); *In re Initial Pub. Offering*, 214 F.R.D. at 123. "In fact, the lead plaintiff in a securities class action has 'a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims." *Connetics*, 2006 WL 3711566, at *4 (quoting *Global Crossing*, 313 F. Supp. 2d at 205).

Thus, to the extent that HIG may speculate about potential class standing or certification issues with respect to Hecla call options, it is well settled that such issues do not decide the appointment of a lead plaintiff. Instead, such issues are resolved "by the appointment, if necessary and desirable, of additional class representatives as the litigation proceeds." *Id.* (citing

Mem. of Law in Further Support of Mot. of
Institutional Investors for Consolidation,
Appointment as Lead Pl., & Approval of Selection
of Counsel, & in Opp'n to Competing Mots.

19

*Global Crossing*, 313 F. Supp. 2d at 205); *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 254 (S.D.N.Y. 2003). Because HIG cannot "make any concrete showing of a conflict of interest between [the Institutional Investors] and stock-option purchasers," and would have to rely "instead on mere speculation about future standing or class-certification issues," HIG cannot rebut "the presumption that [the Institutional Investors are] the most adequate lead plaintiff." *Connetics*, 2006 WL 3711566, at *4 (citing *Glauser v. EVCI Career Colls. Holding Corp.*, 236 F.R.D. 184, 189-90 (S.D.N.Y. 2006)).

## CONCLUSION

For all of the above reasons, and the reasons presented in the Institutional Investors' opening Lead Plaintiff submissions, the Court should appoint the Institutional Investors as lead plaintiffs, Motley Rice LLC as lead counsel, and Gordon Law Offices as liaison counsel.

Dated: May 14, 2012       Respectfully submitted,

           By:   */s/ Philip Gordon*
             Philip Gordon ISBN 1996
             Bruce S. Bistline ISBN 1988
             GORDON LAW OFFICES
             623 West Hays Street
             Boise, ID 83702
             Telephone: (208) 345-7100
             Facsimile: (208) 345-0050
             E-mail: pgordon@gordonlawoffice.com

             *[Proposed] Liaison Counsel for Lead Plaintiffs*

             MOTLEY RICE LLC
             James M. Hughes (*pro hac vice*)
             Ann K. Ritter (*pro hac vice*)
             28 Bridgeside Blvd.
             Mt. Pleasant, SC 29464
             Telephone: (843) 216-9000
             Facsimile: (843) 216-9440
             E-mail: jhughes@motleyrice.com
             E-mail: aritter@motleyrice.com

MOTLEY RICE LLP
Mark I. Labaton
Vincent I. Parrett
1100 Glendon Avenue, 14th Floor
Los Angeles, CA  90024
Telephone: (310) 500-3488
Facsimile: (310) 824-2870
E-mail: mlabaton@motleyrice.com
E-mail: vparrett@motleyrice.com

*[Proposed] Lead Counsel for Lead Plaintiffs*

Mem. of Law in Further Support of Mot. of
Institutional Investors for Consolidation,
Appointment as Lead Pl., & Approval of Selection
of Counsel, & in Opp'n to Competing Mots.

21

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties registered to the Court's CM/ECF system for this action.

I also hereby certify that I caused to be mailed the foregoing document via U.S. Mail to the following non-CM/ECF participants:

Brian O'Mara
Robbins Geller Rudman & Dowd,LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

 */s/ Philip Gordon*
Philip Gordon

Mem. of Law in Further Support of Mot. of
Institutional Investors for Consolidation,
Appointment as Lead Pl., & Approval of Selection
of Counsel, & in Opp'n to Competing Mots.

22