# EXHIBIT A

Philip Gordon ISBN 1996
Bruce S. Bistline ISBN 1988
GORDON LAW OFFICES
623 West Hays Street
Boise, ID 83072
Telephone: (208) 345-7100
Facsimile: (208) 345-0050
E-mail: pgordon@gordonlawoffice.com

*[Proposed] Liaison Counsel for [Proposed] Lead Plaintiffs*

MOTLEY RICE LLC
James M. Hughes (*pro hac vice*)
Ann K. Ritter (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9440
E-mail: jhughes@motleyrice.com
E-mail: aritter@motleyrice.com

*[Proposed] Lead Counsel for [Proposed] Lead Plaintiffs*

*Additional Counsel listed in Signature Page*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRICKLAYERS OF WESTERN PENNSYLVANIA PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HECLA MINING COMPANY, PHILLIP S. BAKER, JR. and JAMES A. SABALA,<br><br>Defendants. | Case No. 1:12-cv-00042-BLW<br><br>CLASS ACTION<br><br>DECLARATION OF PETER J. BUTLER IN SUPPORT OF THE INSTITUTIONAL INVESTORS' MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL |

(caption continued on following page)



| | |
|---|---|
| JOSEPH S. VITA 2001 REVOCABLE TRUST and JOSEPH S. VITA IRA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>HECLA MINING COMPANY, PHILLIP S. BAKER, JR. and JAMES A. SABALA,<br><br>Defendants. | Case No. 2:12-cv-00067-BLW<br><br>CLASS ACTION |

I, PETER J. BUTLER, hereby declare and state as follows:

## INTRODUCTION AND QUALIFICATIONS

1. I am a Principal with Valtrend, LLC, a business valuation and litigation support firm based in Eagle, Idaho. Valtrend provides valuation services for a variety of purposes, including estate and gift taxes, estate planning, mergers & acquisitions, buy-sell agreements, marital dissolution, and litigation support, among other reasons. I am familiar with the various economic issues that arise in securities class action litigation, including issues related to the selection of lead plaintiff(s).

2. I received a Master of Business Administration from San Diego State University (finance concentration) and a Bachelor of Science in mechanical engineering from the United States Naval Academy in Annapolis, Maryland. Furthermore, I have earned the professional designations Chartered Financial Analyst, sponsored by the CFA Institute, and the Accredited Senior Appraiser (in business valuation), sponsored by the American Society of Appraisers. A summary of my background and qualifications is attached to this Declaration as *Exhibit A*.

## OVERVIEW OF ASSIGNMENT AND CONCLUSION

3. I was asked by Motley Rice LLC, who represents the Institutional Investors, to analyze the relative losses of the two movants for lead plaintiff with the largest claimed losses, the Institutional Investors and the Hecla Investor Group, which is represented by Kessler Topaz Metzler & Check LLP.

## INFORMATION CONSIDERED

4. I relied upon the following documents in forming my opinion:

    a. Bricklayers of Western Pennsylvania Pension Plan v. Hecla Mining Company Complaint for Violation of Federal Securities Laws;
    b. Joseph S. Vita, et al. v. Hecla Mining Company Class Action Complaint;
    c. Memorandum of Law in Support of the Motion of Institutional Investors for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel;
    d. Declaration of Philip Gordon in Support of the Motion of Institutional Investors for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel;
    e. Memorandum of Law in Support of the Hecla Investor Group's Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead and Liaison Counsel;
    f. Declaration of Ramzi Abadou in Further Support of the Hecla Investor Group's Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead and Liaison Counsel;
    g. Tabak, Starykh, and Shotland, "A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud," *Litigation Economics Review*, Volume 5, Number 2: 9-14 (2002);
    h. Usher, "Securities Acts Violations: Derivatives in Securities Acts Violations: Chapter 18," *Litigation Services Handbook The Role of the Financial Expert*, Third Edition (2001);
    i. The Black Scholes Option Pricing Model; and
    j. Hecla daily common stock price and volume data during the Class Period, as well as information on Hecla's call options.

## BACKGROUND

5. Hecla engages in the discovery, acquisition, development, production, and marketing of gold, silver, lead, and zinc. The Company is now involved in this securities class action litigation because of allegations of false and misleading statements between October 26, 2010, and January 11, 2012, inclusive (the "Class Period"), related to compliance with safety regulations at its Lucky Friday mine.

6. In determining the "most adequate plaintiff," the Private Securities Litigation Reform Act ("PSLRA") of 1995 provides that:

> *[T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this [Act] is the person or group of persons that –*
> *(aa) has either filed the complaint or made a motion in response to a notice...;*
> *(bb) in the determination of the court, has the largest financial interest in the relief sought by the class, and*
> *(cc) otherwise satisfies the requirements of Rule 23.*

7. With respect to the qualifications of a class representative, Rule 23(a) requires generally that its claims be typical of the claims of the class and that the representative will fairly and adequately protect the interests of the class. With respect to class certification, Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) such claims are typical of those of the class; and (4) the representative will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

8. I will address below which (potential lead) plaintiff(s) have the largest financial interest in the relief sought by the class, as well as which claims are "typical" of the class from an economic perspective.

9. The Institutional Investors are claiming losses of either $1,195,643 (LIFO basis) or $1,303,554 (FIFO basis).[1] Moreover, the Institutional Investors only purchased Hecla common stock. On the other hand, the Hecla Investor Group is claiming losses of $1,710,429. However, a large majority of these alleged losses correspond to transactions involving call options. David Quist is claiming losses of $1,033,961 and Peter Quist is claiming losses of $351,807, totaling $1,385,768 in alleged losses related to call options. These alleged option losses represent approximately 81% ($1,385,768/$1,710,429) of their combined claimed losses. Moreover, the Hecla Investor Group is claiming 100% of the original option costs as alleged losses, whereas potential lead plaintiff(s) who are common stock holders are merely claiming a fraction of their original cost.

10. For purposes of calculating losses, both movant groups used their Plaintiffs' original cost per common share less approximately $4.94 (the average closing price per share from January 12, 2012 – March 30, 2012). Thus, if one only compares estimated common stock losses, the Institutional Investors' claims remain the same at either $1,195,643

---

[1] LIFO stands for "last-in, first-out"; FIFO stands for "first-in, first-out." There is a difference between the FIFO and LIFO calculations because one of the members of the Institutional Investors, Atlanta General Employees' Pension Fund, owned shares prior to the start of the Class Period. FIFO assumes those shares would be sold first, rather than the shares purchased during the Class Period. Therefore, under the FIFO accounting convention, more shares purchased during the Class Period are retained and, therefore, damaged at the end of the Class Period.

(LIFO basis) or $1,303,554 (FIFO basis), and the Hecla Investor Group's claims decrease to only $324,661 ($1,710,429 - $1,385,768). Thus, the pertinent question is: Who has the larger financial interest in this case if losses based on transactions in call options during the period are considered?

## ANALYSES

11. On the surface, if one includes 100% of alleged option losses, it appears that the Hecla Investor Group has the larger financial interest in the litigation. But, their loss calculations are problematic. The Hecla Investor Group included as alleged losses the entire cost to purchase the call options under one of the following assumptions:

    a. The option traders would not have purchased the options had they known about the fraud, or
    b. The call options expired worthless due solely to the fraud.

    Below I present an economically rational and less speculative way to calculate damages for these specific call options that does not consider the losses on the call options to be 100%. The result leads to the conclusion that the Hecla Investor Group's claims are inflated.

12. A call option grants the owner the right to purchase a share of stock at an agreed-to price – known as the strike price – for a certain amount of time. Call options have value even if they are "out-of-the-money"[2] today because there is some probability that they will be "in-the-money"[3] at or before expiration. This is known as the time value of the option.

13. There is no debate that a call option investor can be damaged by purchasing an inflated call, if the price of the underlying stock is inflated by misleading statements and/or omissions. The following summarizes the Quist members' options purchases during the Class Period:

    a. David Quist bought January 2012[4] call options from late January 2011 through mid-March 2011 at various prices. Of note, however, is that all of these call options had strike prices of either $10.00 or $12.50.

    b. The Peter Quist Family Trust (the "Trust") also purchased January 2012 call options in January 2011 with strike prices of either $10.00 or $12.50. The Trust

---

[2] "Out-of-the-money" is when an option's strike price is greater than the current stock price of the underlying stock.
[3] "In-the-money" is when the intrinsic value of the option is positive because the strike price is less than the current stock price.
[4] The options would expire in January 2012.

Declaration of Peter J. Butler, CFA, ASA re: Determination of Lead Plaintiff(s)　　　　Page 5

also purchased June 2011 call options in December 2010 with a strike price of $15.00.

14. One could presumably ask these specific plaintiffs if they still would have purchased call options (of course, not the same options with the existing terms since the "but-for" price of the stock would have been different) in Hecla common stock if they had known about the fraud. To do this for every option holding class member, however, would be impractical and unwieldy, and would not be compatible with the requirements for class certification. Moreover, many investors purchasing an option position in common stock typically choose a strike price relative to the share price. Thus, a reasonable assumption is that many call option holders of the putative class would still have purchased options in Hecla common stock – just on different terms – absent the fraud. Thus from this perspective, it makes no sense to include the entire cost of the options as alleged damages.

15. This leaves the remaining question: Did the call options expire worthless due *solely* to the fraud? For obvious reasons the word "solely" is a difficult hurdle to overcome due to some of the observations below.

   a. The highest Hecla common stock ever reached during the Class Period was $11.56 per share on January 3, 2011.

      i. Thus, even while artificially inflated, Hecla's $12.50 strike price was "out-of-the-money" by $0.94 ($12.50 – $11.56) on its "best day." Moreover, Hecla's $15.00 strike price was "out-of-the-money" by $3.44 ($15.00 – $11.56) on its "best day." The more "out-of-the-money" a stock option is at any given point in time, all else being equal, the more likely it will expire worthless.

      ii. The Hecla Investor Group is claiming $186,864 ($76,700 + $190 + $2,834 + $107,140) in alleged losses for call options with strike prices of $12.50. They are also claiming $49,125 in alleged losses for call options with strike prices of $15.00. It is possible that all of these options would have expired worthless even without the fraud-correcting disclosure(s) entering the market.

      iii. While the $10.00 strike price options had a lower hurdle to climb to be "in-the-money," of course it was still possible that these options also would have expired worthless even without the fraud-correcting disclosure(s).

    b. Nothing was exchanged when the call options expired worthless in June 2011 and January 2012. Therefore, "courts have generally not looked favorably on a claim that but-for a fraud a transaction would have occurred, regarding such claims as inherently speculative."[5]

16. There is a better way to calculate damages for specific options holders such as the Hecla Investor Group members: the Black-Scholes Option Pricing Model ("BSOPM").[6] The BSOPM requires various inputs to calculate the value of a call option, including:

    a. The share price;
    b. The strike price;
    c. The dividend yield of the stock[7];
    d. The risk-free interest rate over the term of the option; and
    e. The expected volatility of the stock.

17. The idea behind this analysis is that the plaintiffs would have purchased the "same" call options, except with the price inflation removed from the stock. Everything was provided to me except the expected volatilities, which I can calculate because I know the prices of the various call options. I then input the known parameters in paragraph 16b - 16e above into the BSOPM, except I subtract $0.90[8] from the actual share price to calculate the estimated "true" cost of the various call options. Subtracting $0.90 from the stock price results in a lower call price since the option is "out-of-the-money" by a wider margin. Thus, estimated damages are merely the actual price paid for the options minus the "true" cost of the call options. Please see *Schedule 1* for more details and the observation that, under the BSOPM, the Hecla Investor Group option holders incurred damages materially less than estimated in their motion.

18. Using these assumptions, I calculate that David Quist incurred approximately $284,000 in option damages rather than the $1,034,000 claimed. Moreover, using these assumptions and considering inflated option sales as the claims for the Trust did, I calculate that the Trust incurred approximately $38,000 in net damages related to call

---

[5] Tabak, Starykh, and Shotland, "A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud," *Litigation Economics Review*, Volume 5, Number 2: 9-14 (2002), p. 13
[6] Options do not trade every day, eliminating price reactions as a viable alternative to analyze impact of fraud-correcting disclosures as is commonly used with common stock. Therefore, the BSOPM, a well accepted option pricing model, is the best way to analyze damages for option holders.
[7] Hecla has not paid a dividend on its common stock since 1990. Thus, its dividend yield is 0%.
[8] To be consistent with how common stock losses were calculated in the various motions, I used $4.94 in my analyses. Prior to the disclosure on January 11, 2012, the stock closed at $5.84 on January 10, 2012. Thus, the difference between $5.84 and $4.94 is $0.90, which I used as inflation in the stock. (See "The Truth Begins to Emerge" in paragraph 37 of the Vita et al. complaint)

options rather than the approximate $352,000 claimed. Thus, I estimate that the Hecla Investor Group only incurred damages of approximately $646,433 ($283,903 + $37,870 + $232,390 + $8,918 + $83,352), which is materially less than the Institutional Investors' estimated losses of either $1.195 million or $1.304 million. It is also materially less than what the Hecla Investor Group has claimed in losses equal to approximately $1,710,000.

19. Moreover, the Trust benefited by selling 35,000 pre-Class Period common shares at inflated prices on January 20, 2011[9].

## RULE 23A: OTHER PERTINENT OBSERVATIONS

20. The option valuation exercise I describe above and show in *Schedule 1* was time consuming – just for the Hecla Investor Group's options. Moreover, each option contract had different damages - *even with the same inflation per share in the stock price*. Also, each option contract will have different damages on every day of the Class Period. That is because there are five dynamic inputs into any option valuation on any given day:

   a. Different stock prices relative to the strike prices;
   b. Different times to maturity;
   c. Different risk-free rates;
   d. Different dividend yields[10]; and
   e. Different implied volatilities.

Moreover, since obtaining every option holder's trading records at this stage of the litigation is a futile exercise, estimating alleged call option damages involves calculating the loss associated with each option contract on each day of the Class Period and then determining the volume attached to each contract for each day of the Class Period. Estimating the alleged damages volume for all of the contracts (the potential lead plaintiffs were involved with only five contracts,[11] for example) requires intricate calculations that keep track of changes in open interest and trading volume and the relation between these two variables.[12] Thus, to calculate damages for the entire class of option holders in this manner would be a daunting and expensive task. In summary, there is no "typical" option holder per se as each contract (for example, the June 2011 call versus the January 2012 call) reacts differently to the fraud. Moreover, even the same

---

[9] Atlanta General Employees' Pension Fund also benefited by selling 27,437 pre-Class Period shares at inflated prices in April and May 2011.
[10] This variable is not present in this case because Hecla does not pay a dividend on its common stock.
[11] As a frame of reference, as of May 2012, there were 66 different call option contracts on Hecla's common stock (Source: www.finance.yahoo.com)
[12] Usher, "Securities Acts Violations: Derivatives in Securities Acts Violations: Chapter 18," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition (2001)

option contract (for example, the January 2012 call) reacts differently every single day of the Class Period.

21. A call option on a stock is just different than the underlying stock it is associated with. A call option allows an investor to "leverage" his or her "bet." For example, if a stock's price is $10.00, one can buy 100 shares of this stock for $1,000, or one can buy a call option. If the price of a call option on this stock is $1.00, one can potentially gain access to 100 shares of stock for only $100 (the call premium). Of course, one must then pay the exercise price too, assuming the call option is "in-the-money," to gain control of the shares. If the call option expires "out-of-the-money," one's original $100 investment, or "bet," was for naught. Thus as shown above, options are worth just a fraction of the underlying common stock. Therefore, relative to common stock, they have limited (gross) downside. Yet, according to the Hecla Investor Group, these option holders should be compensated for their entire investment or all of their (gross) downside, whereas common stock holders will only get a fraction of their original purchase.

## CONCLUSION

22. In my opinion, the BSOPM is the more accurate method for calculating the approximate losses the options traders suffered in this case, as opposed to considering the options traders' losses as equaling 100%. Under the BSOPM, the Hecla Investor Group's losses are more accurately calculated as being approximately $646,000.

23. I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief. This declaration was executed this 10th day of May 2012 at Boise, Idaho.

*[signature]*

Peter J. Butler, CFA, ASA

**Hecla Mining Company**
**Call Option Damages Analyses**
**BSOPM**

David Quist

| | | Actual Transactions | | | | | | Hypothetical Transaction | | | Estimated Damages | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security | Strike Price | Trade | Date | Contracts | Price | Cost | Artificially High Actual Closing Stock Price | Implied Volatility | 'True' Closing Stock Price | 'True' Option Price | Actual Option Price - True Option Price | Contracts | Damage |
| Jan 2012 Call | $10.00 | Buy | 1/27/2011 | 1,000 | $1.82 | $182,000 | $8.60 | 67.37% | $7.70 | $1.36 | $0.46 | 1,000 | $46,400 |
| Jan 2012 Call | $10.00 | Buy | 1/27/2011 | 1,000 | $1.83 | $183,000 | $8.60 | 67.66% | $7.70 | $1.37 | $0.47 | 1,000 | $46,500 |
| Jan 2012 Call | $10.00 | Buy | 1/27/2011 | 361 | $1.65 | $59,565 | $8.60 | 62.41% | $7.70 | $1.20 | $0.45 | 361 | $16,101 |
| Jan 2012 Call | $10.00 | Buy | 1/27/2011 | 639 | $1.68 | $107,352 | $8.60 | 63.29% | $7.70 | $1.23 | $0.45 | 639 | $28,691 |
| Jan 2012 Call | $12.50 | Buy | 1/28/2011 | 650 | $1.18 | $76,700 | $9.09 | 59.90% | $8.19 | $0.84 | $0.34 | 650 | $22,035 |
| Jan 2012 Call | $10.00 | Buy | 1/28/2011 | 423 | $1.74 | $73,602 | $9.09 | 57.42% | $8.19 | $1.28 | $0.46 | 423 | $19,627 |
| Jan 2012 Call | $10.00 | Buy | 1/28/2011 | 77 | $1.76 | $13,552 | $9.09 | 57.96% | $8.19 | $1.29 | $0.47 | 77 | $3,588 |
| Jan 2012 Call | $12.50 | Buy | 3/11/2011 | 2 | $0.95 | $190 | $9.00 | 59.50% | $8.10 | $0.65 | $0.30 | 2 | $60 |
| Jan 2012 Call | $10.00 | Buy | 3/16/2011 | 1,500 | $1.40 | $210,000 | $8.15 | 67.79% | $7.25 | $0.99 | $0.41 | 1,500 | $61,500 |
| Jan 2012 Call | $10.00 | Buy | 3/16/2011 | 1,000 | $1.28 | $128,000 | $8.15 | 63.75% | $7.25 | $0.89 | $0.39 | 1,000 | $39,400 |
| Total | | | | 6,652 | | $1,033,961 | | | | | | 6,652 | $283,903 |

**Peter M. Quist Family Trust**

| | | Actual Transactions | | | | | | Hypothetical Transaction | | | Estimated Damages | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security | Strike Price | Trade | Date | Contracts | Price | Cost | Artificially High Actual Closing Stock Price | Implied Volatility | "True" Closing Stock Price | 'True' Option Cost | Actual Option Price - True Option Price | Contracts | Damage |
| Jun 2011 Call | $15.00 | Buy | 12/8/2010 | 655 | $0.75 | $49,125 | $10.23 | 47.12% | $9.33 | $0.51 | $0.24 | 655 | $15,786 |
| Jan 2012 Call | $10.00 | Buy | 1/26/2011 | 25 | $1.68 | $4,200 | $9.07 | 56.04% | $8.17 | $1.22 | $0.46 | 25 | $1,145 |
| Jan 2012 Call | $10.00 | Buy | 1/26/2011 | 975 | $1.70 | $165,750 | $9.07 | 56.60% | $8.17 | $1.24 | $0.46 | 975 | $44,850 |
| Jan 2012 Call | $10.00 | Buy | 1/28/2011 | 253 | $1.93 | $48,829 | $9.09 | 62.76% | $8.19 | $1.45 | $0.48 | 253 | $12,144 |
| Jan 2012 Call | $10.00 | Buy | 1/28/2011 | 12 | $1.94 | $2,328 | $9.09 | 63.04% | $8.19 | $1.46 | $0.48 | 12 | $577 |
| Jan 2012 Call | $10.00 | Buy | 3/8/2011 | 1,000 | $1.77 | $177,000 | $9.49 | 57.21% | $8.59 | $1.30 | $0.48 | 1,000 | $47,500 |
| Jan 2012 Call | $12.50 | Buy | 1/26/2011 | 26 | $1.09 | $2,834 | $9.07 | 57.55% | $8.17 | $0.76 | $0.33 | 26 | $848 |
| Jan 2012 Call | $12.50 | Buy | 1/26/2011 | 974 | $1.10 | $107,140 | $9.07 | 57.83% | $8.17 | $0.77 | $0.33 | 974 | $31,850 |
| Total | | | | 3,920 | | $557,206 | | | | | | 3,920 | $154,699 |

| | | Actual Transactions | | | | | | Hypothetical Transaction | | | Estimated Proceeds | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Security | Strike Price | Trade | Date | Contracts | Price | Proceeds | Artificially High Actual Closing Stock Price | Implied Volatility | True Closing Stock Price | True' Option Price | Actual Option Price - True Option Price | Contracts | Artificially high proceeds |
| Jan 2011 Call[1] | $7.50 | Sell | 1/20/2011 | 213 | $1.41 | $30,033 | $8.95 | N/A | $8.05 | $0.55 | $0.86 | 213 | $18,318 |
| Jan 2011 Call[1] | $7.50 | Sell | 1/20/2011 | 287 | $1.43 | $41,041 | $8.95 | N/A | $8.05 | $0.55 | $0.88 | 287 | $25,256 |
| Mar 2011 Call | $10.00 | Sell | 1/20/2011 | 2,116 | $0.48 | $101,568 | $8.95 | 58.97% | $8.05 | $0.22 | $0.26 | 2,116 | $55,651 |
| Mar 2011 Call | $10.00 | Sell | 1/20/2011 | 597 | $0.50 | $29,850 | $8.95 | 60.42% | $8.05 | $0.23 | $0.27 | 597 | $16,059 |
| Mar 2011 Call | $10.00 | Sell | 1/20/2011 | 57 | $0.51 | $2,907 | $8.95 | 61.14% | $8.05 | $0.24 | $0.27 | 57 | $1,545 |
| Total | | | | 3,270 | | 205,399 | | | | | | 3,270 | $116,829 |

Net damages for the Trust     $37,870

**Total Option Related Damages:**     $321,773

[1] One day prior to expiration. The volatility is immaterial

1 of 1

# EXHIBIT A

## PETER BUTLER, CFA, ASA, MBA

### *Education*:

United States Naval Academy

> BS Mechanical Engineering, 1986

San Diego State University

> MBA, Finance Concentration, 1994

### *Certifications*:

Chartered Financial Analyst (CFA) designation, 1998

Accredited Senior Appraiser (ASA) designation in business valuation, 2001; re-accredited, 2006 and 2011

Institute of Leading Business Appraisers (ILBA) designation, 2010

### *Current Employment*:

Valtrend, LLC – An independent business valuation, mergers & acquisitions advisory and litigation support firm.

> Principal (2010 – present)

George Fox University

> Adjunct Faculty Professor of Finance in the MBA program (2010 – present)

### *Applicable Professional Experience:*

Valuation of privately-held businesses for litigation support, estate and gift tax reporting, financial reporting, ESOPs, 409A, and mergers/acquisitions, including fairness opinions and purchase price allocations.

Valuation of publicly traded securities involved in securities class action litigation.

Venture capital investment.

Analysis and calculation of economic damages.

Inventor and co-developer of a technique which quantifies company-specific risk for the first time in the business valuation profession. Led the national/international introduction of the technique, known as the Butler Pinkerton Calculator$^{TM}$ (BPC) or the Total Cost of Equity Calculator$^{TM}$, to the valuation industry. The BPC is commercially available as a web-based software program located on Business Valuation Resources' website (www.bvmarketdata.com) and has subscribers across the United States and in some international markets.

Primary (or sole) author of articles in United States business valuation journals: *Business Valuation Review*, *Business Valuation Update*, *Business Appraisal Practice*, *The Value Examiner* and *Valuation Strategies*

Author of an article in a Romanian Business Valuation Journal, *ANEVAR*.

Ongoing columnist in the following Idaho-based publications: *The Idaho Business Review* and *The Adjusting Entry*.

Regularly speak, including sometimes as a keynote speaker, on business valuation topics to fellow analysts/appraisers at international, national, regional and state conferences.

Expert witness (federal and state court) testimony

### *Professional Memberships and Activities*:

#### *Present:*

American Society of Appraisers-Business Valuation (1999 – present)

CFA Institute (1995 – present)

CFA Society of Idaho (2004 – present):

    President (2008 – present: Four terms)

Blue and Gold Officer for the U.S. Naval Academy (2008 – present)

#### *Prior:*

CFA Society of Idaho:

    Secretary (2005 – 2006)

    Program Committee (2005 – 2006)

    Treasurer (2006 – 2007)

    Vice President/Program Chair (2007 – 2008)

       Program chair (2008 – 2009)

American Society of Appraisers, San Diego Chapter (1999 – 2004):

       Business Valuation Chairperson (2001 – 2004)

       Membership Chairperson (2003 - 2004)

       First Vice President (2003 – 2004)

Financial Analysts Society of San Diego (1995 – 2004)

### *Public Service and Community Activities:*

Boise Metro Chamber of Commerce:

       Member of Small Business Recognition Sub-committee (2005)

       Graduate of Leadership Boise (Class of 2005 – 2007)

Blue and Gold Officer: U.S. Naval Academy (2008 – present)

West Valley Little League

       Umpire (2009 – present)

       Assistant Coach (2011 – present)

       Board Member: Player-Agent (2010 – present)