UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRICKLAYERS OF WESTERN PENNSYLVANIA PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>HECLA MINING COMPANY, *et al.*,<br><br>　　　　　Defendants. | Case No. 2:12-cv-00042-BLW<br><br>Case No. 2:12-cv-00067-BLW<br><br>**ORDER** |
| JOSEPH S. VITA 2001 REVOCABLE TRUST and JOSEPH S. VITA IRA, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>HECLA MINING COMPANY, *et al.*,<br><br>　　　　　Defendants. | |

## INTRODUCTION

The Court has before it competing Motions to Appoint Lead Plaintiffs and Appoint Counsel. For the reasons stated below the Court GRANTS the motion of the

MEMORANDUM DECISION AND ORDER - 1

Institutional Investors and DENIES all other motions. The Court names the Institutional Investors the presumptive lead plaintiffs in this action.

## BACKGROUND

This case is a securities class action suit against Hecla Mining Company, et al. ("Hecla"). The plaintiffs allege that during the class period, Hecla issued materially false and misleading statements regarding the company's business, and that those false statements caused artificially inflated prices for Hecla's securities. On January 11, 2012, Hecla announced that one of their major mines would close for a year, significantly reducing the company's silver production for 2012. Once Hecla's allegedly misleading statements came to light with this announcement, its stock prices dropped $1.23 per share.  This was a one-day decline of 21%.

A number of parties filed motions to consolidate the two largely identical cases against Hecla and to claim lead plaintiff status in the class action. The Court granted the motions to consolidate on April 17, 2012. At this time only five motions to appoint lead plaintiff remain pending:

1. Jeffrey A. Farkas and David G. Ray (collectively, the "Hecla Investor Group") claim a loss of $696,138 (FIFO) or $376,250 (LIFO); they propose the Faruqi Firm as counsel;

2. LRI Invest S.A. and City of Atlanta General Employees' Pension Fund (collectively, "Institutional Investors") claim $1,303,554 (FIFO) or $1,195,643 (LIFO); they propose Motley Rice as lead counsel, Gordon Law Offices as liaison;

3. Carpenters Pension Fund of West Virginia ("West Virginia") claims a $17,143 loss; it proposes Robbins Geller as lead counsel, Gordon Law Offices as liaison;

4. Cambria County Employees' Retirement System, Peter M. Quist, and David W. Quist (here referred to collectively as "Cambria and Quist") claim a loss of $1,710,428; they propose Kessler Topaz Meltzer & Check as lead counsel, Banducci Woodard Schwartzman as liaison; and

5. James R. Holton and Michael Schneider ("Holton and Schneider") claim losses of $914,479; they propose the Pomerantz firm as lead counsel, Cosho firm as liaison.[1]

## LEGAL STANDARD

The modern standard for selecting the lead plaintiff in securities class actions comes from the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which is found in 15 U.S.C. § 78u-4(a). According to the statute, the plaintiff who filed the action have 20 days to publish notice of the action, advising members of the purported plaintiff class that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u-4(a)(3)(A)(i).

Upon hearing responses to the notice, the Court appoints as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most

---

[1] Although Holton and Schneider's motion is technically still pending, they effectively withdrew their request to be lead plaintiff in their response brief. Accordingly, the Court will deny their motion below.

capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The Court does this by adopting a presumption that the most adequate plaintiff is the person or group of persons that: (1) has either filed the complaint or made a motion in response to a proper notice; (2) according to the court has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23. 15 U.S.C. 78u-4(a)(3)(B)(iii)(I).

Once the presumption is established by the Court, it may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff either (1) will not fairly and adequately protect the interests of the class; or (2) is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. 78u-4(a)(3)(B)(iii)(II). The most adequate plaintiff selects and retains counsel to represent the class, subject to approval by the court. 15 U.S.C. 78u-4(a)(3)(B)(v).

In *In re Cavanaugh*, 306 F.3d 726 at 729 (9th Cir. 2002), the Ninth Circuit explained that the statute creates a three-step process. The first step is to publicize the pending action, claims, and class period. *Id.* This step also includes a Court's decision regarding consolidation of multiple actions if necessary, since the PSLRA dictates that this determination precedes selection of a lead plaintiff. 15 U.S.C. 78u-4(a)(3)(B)(ii).

The second step is for the Court to appoint a presumptive lead plaintiff. *Cavanaugh*, at 729-30. To do this, "the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Id.*

at 730. The Ninth Circuit recommends that the district court compare plaintiffs' financial stakes by calculating each potential lead plaintiff's financial interest using rational and consistent accounting methods. *Id.*, n. 4. Some courts do this by analyzing four "Olsten-Lax" factors: (1) The number of shares purchased during the class period; (2) The number of net shares purchased during the class period; (3) The total net funds expended during the class period; and (4) The approximate losses suffered during the class period. *In re Ribozyme Pharm., Inc. Sec. Litig.*, 192 F.R.D. 656, 660 (D. Colo. 2000); see also *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y. 1998) (citing *Lax*, 1997 WL 461036, at *5). But as explained below, that process is not always helpful.

Once the Court identifies the plaintiff with the largest financial stake, "it must then focus its attention on *that* plaintiff and determine, based on the information it has provided in its pleadings and declarations, whether it satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Cavanaugh*, at 730 (emphasis in original). The relevant portion of Rule 23(a) demands "the claims or defenses of the representative parties are typical of the claims or defenses of the class; and . . . the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

The final step is to "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Cavanaugh,* at 730. For purposes of this rebuttal, if a plaintiff can demonstrate "a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable

of adequately representing the class," then that plaintiff may be allowed to conduct discovery.15 U.S.C. § 78u-4(a)(3)(B)(iv).

## ANALYSIS

We are currently on step two of the *Cavanaugh* three-step process. After the Court issues this decision and order, the plaintiffs may have an opportunity to rebut the presumptive lead plaintiff's showing of Rule 23 typicality and adequacy. But for now, the burden to demonstrate compliance with Rule 23 is more relaxed. Thus, while the Court considers Rule 23 standing, the focus of this opinion is upon which plaintiff has the "largest financial interest" in the class action or, as the Ninth Circuit has put it, which plaintiff "has the most to gain from the lawsuit." *Cavanaugh,* at 730.

1.  **Cambria and Quist v. Institutional Investors**

Although one or two other plaintiffs claim they have the most to gain from the lawsuit, the real battle is between Institutional Investors and Cambria and Quist. Cambria and Quist claim the highest losses among all movants at just over $1.7 million. *Quist Opp.* at 7, Dkt. 61. However, the Court does not compare competing losses based on the size of the movants' claims alone – rather, some valuation analysis is required. *Cavanaugh*, at 730, n. 4.

To reach their claim amount, Cambria and Quist place the value of a call option at the entire price of the option. Institutional Investors challenge this method of valuation. *Investors Memo* at 3-5, Dkt. 55. They argue that it is more accurate to employ the Black-Scholes Option Pricing Model ("BSOPM"), a model intended for calculation of damages

for option holders. *Id.* at 5. Under this model, the Institutional Investors' expert has calculated Cambria and Quist's losses at a mere $646,433 – significantly less than the calculation of Cambria and Quist's expert of $1,710,428. *Id*. at 7.

This lower valuation is based upon the nature of call options, as opposed to shares of common stock. According to the Institutional Investors' expert, the worth of call options depends upon the price of the underlying stock reaching and exceeding a "strike price." *Butler Decl.* at ¶ 14, Dkt. 59. Call options also have expiration dates, after which if the option has not been redeemed, it expires and is worthless. The basis of Institutional Investors' valuation of Cambria and Quist's options is that it is impossible to say whether the Quists would have purchased the options had they known about the alleged fraud; they may have merely purchased the options under different terms. *Investors Memo* at 3, Dkt. 55. BSOPM assumes that "plaintiffs would have purchased the 'same' call options, except with the price inflation removed from the stock." *Butler Decl.* at ¶ 17, Dkt. 59.

In response, Cambria and Quist note that BSOPM is a method of establishing *damages*, and that necessary analysis at this stage of the proceedings is far less exhaustive than the analysis necessary to establish damages. *Quist Reply* at 2-3, Dkt. 66. The determination of damages is quite different from measuring financial interest, or losses, for purposes of selecting  a presumed lead plaintiff. In fact, losses are a preliminary finding while damages require a good deal of competing evidence, and often competing expert testimony. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004); *see also Ribozyme*, at 661-62; *Cavanaugh* at 730-31.

**MEMORANDUM DECISION AND ORDER - 7**

Furthermore, the question of whether Cambria and Quist would have purchased the same amount of stock options on Hecla stock but-for the alleged fraud is essential to the Institutional Investors' BSOPM valuation. But this dispositive question relates to loss causation, and therefore damages.

Adopting either party's valuation as establishing damages at this point in the proceedings would be inappropriate. Likewise, establishing damages here as a result of the Court's analysis would be inappropriate. Therefore, the Court is left with the difficult task of comparing the financial interests of these two movant groups. Much like comparing apples to oranges, the Court must compare stocks to options because both types of securities are essential to this class action.

Other courts have used the four Olsten-Lax factors listed above when comparing plaintiffs' financial stakes. However, although factors such as the number of shares purchased, net shares purchased, and total funds expended are highly relevant to the comparison of two movants' holdings of common stock, the relative price and value of call options throws the analysis off. In other words, the price and value of a single share of common stock is very different from the price and value of a single call option. The options' valuable lives are limited, their value is conditional, and there is a large disparity between their price and their potential value. Therefore, the Court finds that the Olsten-Lax test is not helpful in this case. Ultimately, the Court is faced with two competing valuations for Cambria and Quist's losses on call options, neither of which is necessarily accurate – or at least very easy to determine at this stage.

Under these circumstances, the Court notes that the initial calculation of losses in a PSLRA case is intended to give an approximation of "financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). As the Ninth Circuit clarified, the Court should look to which movant has "the most to gain from the lawsuit." *Cavanaugh* at 730, n. 4; *see also Eichenholtz v. Verifone Holsings, Inc.*, 2008 WL 3925289, at 4 (N.D.Cal. Aug. 22, 2008). Thus, the loss calculation adopted by the Court should reflect the relief reasonably recoverable by the movant.

With this understanding, the Court finds that Cambria and Quist's loss approximation is too high because it is not realistically related to what the movant is likely to be able to recover. It is true that this is not the time for calculation of damages or determining causation, but it seems plain from the analysis performed by Institutional Investors' expert that the reasonably recoverable loss suffered by Cambria and Quist, and thus its financial interest in the class action, is significantly lower than claimed. And the Court notes that Cambria and Quist do not object to BSOPM as a method of establishing damages; rather, Cambria and Quist only object to its application at this stage of the proceedings.

Therefore, although the Court does not specifically adopt Institutional Investors' BSOPM valuation as Cambria and Quist's damages, the Court is nevertheless persuaded that the actual amount of recoverable damages for Cambria and Quist's call options, and thus its relevant loss, is probably closer to the $646,000 valuation determined by

**MEMORANDUM DECISION AND ORDER - 9**

Institutional Investors' expert than the $1.7 million claimed by Cambria and Quist.[2]

Therefore, the Court finds that the Institutional Investors, with an uncontested loss of $1.3 million, has the most to gain from the law suit.[3]

### 2. Rule 23 Standing

Having determined that Institutional Investors have the largest financial stake, the Court must turn its attention to whether, based on the information it has provided in the pleadings and declarations, they satisfy the requirements of Rule 23(a), in particular those of typicality and adequacy. *Cavanaugh*, at 730. But this need only be a preliminary showing at this initial stage of the litigation. *See Ferrari v. Impath, Inc.*, 2004 U.S. Dist. WL 1637053, at *4 (S.D.N.Y. July 20, 2004); *see also Niederklein v. PCS Edventures!.com, Inc.,* 2011 U.S. Dist. WL 759553, at *9 (D. Idaho Feb. 24, 2011).

The typicality requirement is satisfied when the "claims or defenses of the representative parties are typical of the claims or defenses of the class." F. R. Civ. P. 23(a)(3). More specifically, it is satisfied when the lead plaintiff's alleged injuries arise from "the same course of conduct complained of by the other plaintiffs and his causes of actions are founded on similar legal theories." *Schonfield v. Dendreon Corp.*, 2007 WL 2916533, *4 (W.D. Wash. Oct. 4, 2007). Institutional Investors allegedly suffered

---

[2] The Court also notes that under the Institutional Investors' BSOPM valuation, the ratio of Cambria and Quist's total loss to net expenditure over the class period is much more reasonably related to the same ratio for other movants who held common stock only. For example, Institutional Investors' loss-expenditure ratio (using FIFO) is 0.27 (1,303,555 / 4,834,030), while Cambria and Quist's is 0.35 under BSOPM (646,433 / 1,874,477) and 0.91 under its own claim (1,710,428 / 1,874,477). Under Cambria and Quist's valuation, it is unreasonably more profitable to lose money on call options than on common stock.

[3] The Court is also generally more comfortable appointing Institutional Investors, given the tentative amount of Cambria and Quist's relevant loss.

damage from purchasing Hecla securities, relying upon allegedly false and misleading statements released by the defendant company. *Pl.'s Memo* at 14-15, Dkt. 55. This is typical of the class.

In order to satisfy the adequacy requirement of Rule 23, the movant must make a preliminary showing that it "will fairly and adequately protect the interests of the class." F. R. Civ. P. 23(a)(4). It is satisfied in this context "if there are no conflicts between the representative and class interests and the representative's attorneys are qualified, experienced, and generally able to conduct the litigation." *Richardson v. TVIA, Inc.*, 2007 WL 1129344, *4 (N.D.Cal. 2007).

There appear to be no conflicts between the interests of Institutional Investors and the rest of the class. As typical members of the class, Institutional Investors' interests align with those of the class – they seek compensation for alleged damages. As they indicated in their memo, Institutional Investors have taken steps to demonstrate a willingness to protect the interests of the class, including retaining experienced counsel. *Pl.'s Memo* at 15, Dkt. 55. There is no evidence suggesting a conflict between Institutional Investors and any member of the class. Institutional Investors are composed of two institutions with significant resources, in keeping with Congress's preferences for institutional lead plaintiffs.[4] For the purposes of this analysis, Institutional Investors'

---

[4] Congress formulated the PSLRA "to increase the likelihood that institutional investors will serve as lead plaintiffs." *In re Cendant Corp. Litig.*, 264 F.3d 201, 244 (3d Cir. 2001) (quoting S. Rep. No. 104-98, at 10 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 and H.R. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733). It did so because "[i]nstitutional

counsel seem "qualified, experienced, and generally able" to represent the class. *Richardson*, at *4; *see* Gordon Decl. Ex. D, Ex. E. Still, other movants have raised several challenges to Institutional Investors' Rule 23 compliance.

          (1)     ***Cambria and Quist's Challenges***

Cambria and Quist argue that Institutional Investors group member LRI is not a typical class member because it is an investment advisor, and its reported losses are presumably the losses of its clients, not of the organization itself. *Quist Opp.* at 18, Dkt. 61. However, the Institutional Investors have presented substantial argument and evidence that LRI is an investment management company responsible for an "FCP" fund. *Investors Reply* at 7-8, Dkt. 65. According to the Institutional Investors' legal expert, LRI is the only interested party legally able to seek damages in the class action – the FCP has no "legal personality," and its investors have no power to manage and administer the fund. *Kremer Decl.* at ¶¶ 15-16, 18, Dkt. 58. Thus, it would seem that LRI is sufficiently typical to satisfy Rule 23 as a part of the Institutional Investors.

Cambria and Quist also argue that because Institutional Investors challenge Cambria and Quist's valuation of their losses from call options, substituting a lower valuation, Institutional Investors would "harm the proposed class" by getting a lower recovery for option holders. *Quist Opp.* at 8, Dkt. 61. In effect, this is an attack on Institutional Investors' "adequacy" as lead plaintiffs. However, as the Institutional Investors point out, this argument would disqualify any plaintiff from serving as lead

---

investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake." *Id.* at 264.

plaintiff if they find it necessary to argue, in support of their application, that a competing plaintiff's group has overstated its potential recovery. *Investors Reply* at 9, Dkt. 65. This would remove a "check" from the process and could result in unrealistic, overaggressive valuation. *See Johnson v. Dana Corp.*, 236 F.R.D. 349, 354 (N.D. Ohio 2006). This argument fails to undermine Institutional Investors' adequacy.

Cambria and Quist further question the reliability of the Institutional Investors' counsel. This is an attack on Institutional Investors' satisfaction of the requirement of adequacy. Their counsel must be "qualified, experienced, and generally able to conduct the litigation." *Richardson*, at *4. First, Cambria and Quist argue that since Institutional Investors and West Virginia both employed Gordon Law Offices as liaison counsel, there exists a problematic conflict. *Quist Memo* at 17, Dkt. 61. As Cambria and Quist noted, Mr. Gordon signed and filed separate motions for both clients on the same day asserting that each had the largest financial interest in the action. *Id.* Cambria and Quist also address the status of LRI's attorney Deborah M. Sturman, arguing that Institutional Investors must "describe to the Court what Ms. Sturman's involvement or pecuniary interest, if any, is in this case." *Id.*

At this stage in the proceedings – selecting a presumed lead plaintiff – only a preliminary showing of adequacy is necessary. Following the Court's selection of a presumed lead plaintiff, other movants will have the opportunity to rebut that presumption on the basis of Rule 23 compliance. *Cavanaugh,* at 730. *That* is the time for detailed attacks like these. Even after the rebuttal process, the lead plaintiff's selection of

counsel is subject to the approval of the court. 15 U.S.C. 78u-4(a)(3)(B)(v). In the meantime it is enough for the Court that Mr. Gordon's dual representation has resulted in no harm to either of his clients and that the PSLRA seems to require only the Rule 23 adequacy of a presumed lead plaintiff's appointed counsel *for the class*. These arguments do not overcome Institutional Investors' preliminary showing of typicality and adequacy.

### (2) *West Virginia's Challenges*

West Virginia also challenges Institutional Investors' validity as a proper, cohesive group. "It is clear that groups may be appointed as lead plaintiff under PSLRA." *In re Atlas Mining Co. Sec. Litig.*, 2008 U.S. Dist. WL 821756, at *5 (D. Idaho Mar. 25, 2008). West Virginia freely admits this. *WV Memo* at 7, Dkt. 60. But West Virginia argues, citing the *Atlas Mining* case from this District, that where a group has no pre-existing relationship, the group should not be made lead plaintiff. *Id.*, at 8.

This argument is based upon an important principle of the PSLRA. Part of the Act's purpose is to discourage lawyer-driven class action litigation and races to the courthouse. H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, at 33. The Idaho District Court saw this principle threatened in *Atlas Mining*, in which two members of a movant group were members of another group, represented by different counsel, until just four hours before the filing of the group's motion. *Atlas*, at *5. In a more recent case, this Court recognized the importance of group cohesion, but clarified the strict standard from *Atlas*: "To remain consistent with the purposes of the PSLRA's lead plaintiff provisions, the Court concludes that a pre-existing relationship *or evidence*

*of cohesion* between or among members of the group seeking appointment as lead plaintiff is essential." *Niederklein v. PCS Edventures!.com, Inc.*, 2011 U.S. Dist. WL 759553, at *7 (emphasis added). Thus, it is not a preexisting relationship that is required, but evidence of cohesion, which a preexisting relationship tends to satisfy.

Institutional Investors have submitted evidence and argument that supports the conclusion that they are a proper, cohesive group. *See Investors Memo* at 13, Dkt. 19; *Investors Memo* at 7, Dkt. 65. Institutional Investors members have made declarations regarding their willingness and agreement to act as a cohesive group, their intention to consult together regularly, and their process for sharing information and making decisions. *Investors Memo* at 13, Dkt. 19; *see also Niederklein*, at *7-8. The Institutional Investors have taken reasonable efforts to demonstrate their cohesiveness as a group, and the Court is satisfied that the manner in which the group is constituted would not preclude it from fulfilling its tasks as lead plaintiff. *In re Cendant Corp. Litig.*, 264 F.3d 201, 264 (3d Cir. 2001).

## CONCLUSION

As explained above, Institutional Investors are the movants with the highest reasonably recoverable loss, and they have made a satisfactory preliminary showing of Rule 23 eligibility. Therefore, the Institutional Investors are the presumptive lead plaintiffs, subject to rebuttal by their fellow movants on the basis of Rule 23.

## ORDER

**IT IS ORDERED THAT:**

1. Institutional Investors' Motion for Appointment as Lead Plaintiff (Dkt. 18) is **GRANTED**. Institutional Investors shall be the lead plaintiffs, and their counsel shall be appointed lead counsel.

2. Hecla Investor Group's Motion for Appointment as Lead Plaintiff (Dkt. 12) is **DENIED**.

3. James R. Holton and Michael Schneider's Motion for Appointment as Lead Plaintiff (Dkt. 21) is **DENIED**.

4. Carpenters Pension Fund of West Virginia's Motion for Appointment as Lead Plaintiff (Dkt. 24) is **DENIED**.

5. Cambria County Employees' Retirement System, Peter M. Quist, and David W. Quist's Motion for Appointment as Lead Plaintiff (Dkt. 25) is **DENIED**.

DATED: July 12, 2012

B. Lynn Winmill
Chief Judge
United States District Court